[Civ. No. 43014. Second Dist., Div. Five. Oct. 2, 1974.]

AMERICAN NATIONAL INSURANCE COMPANY,
Plaintiff and Respondent, v.
CONTINENTAL PARKING CORPORATION,
Defendant and Appellant.

**COUNSEL**

Gray, Gorham & Paul and Victor A. Gorham for Plaintiff and Respondent.

Martin S. Stolzoff and S. Zachary Samuels for Defendant and Appellant.

**OPINION**

**KAUS, P. J.**—Unlawful detainer. Defendant Continental Parking Corporation, the lessee, appeals from a judgment for money damages and possession in favor of plaintiff American National Insurance Company, the lessor.

## FACTS

In March 1970, plaintiff lessor and defendant lessee entered into a 25-year written lease for a multi-level parking structure located at 534 South Spring Street in Los Angeles.[1] The monthly rental was about $18,333. Defendant took possession in April 1970.

In June 1972, plaintiff lessor served a three-day notice to pay rent or quit on defendant, demanding rent for June. Defendant neither paid nor quit. That month, plaintiff filed a complaint for unlawful detainer, seeking restitution of the premises and damages. Plaintiff did not seek a forfeiture of the lease. ▆▆ ▆ ▆ On November 17, 1972, a receiver was appointed and took possession of the premises.[2]

Defendant's answer admitted most of plaintiff's allegations but alleged as affirmative defenses, first, "mutual mistake," in that the parties expected "Spring Street occupancy" to remain the same but instead occupancy declined drastically; and, second, that the parties agreed that the lease would be renegotiated or terminated if there was any substantial change in such occupancy.

There was a 33-page typed lease, and no dispute that defendant did not pay the rent. However, at trial, defendant made the following offer of proof: When the lease was entered into, both parties contemplated that plaintiff lessor would build an office structure on top of the existing building, thus creating a captive market for the parking structure. No such office structure was built. Also, when the lease was entered into, parking on Spring Street was $2.00 a day and was contemplated to increase; instead, parking dropped to $1.50 a day. The parties intended that in the foregoing circumstances the lease would be subject to renegotiation or termination.[3]

The trial court excluded all such evidence on grounds that the parol

---

[1] The court found that in January 1970, defendant had sold the property to plaintiff for $2,100,000.

[2] The receivership is not reviewable on this appeal, notwithstanding defendant's request that we take judicial notice of the superior court file. The appeal is from the judgment, which decides only plaintiff's right to damages and to possession of the property. No testimony was offered and no findings were either requested or made concerning the correctness of the receiver's conduct. If, as defendant asserts, the receiver has since the trial settled his accounts with the parties, the order approving the receiver's final account was appealable. (*Title Ins. & Trust Co.* v. *Calif. etc. Co.,* 159 Cal. 484, 491 [114 P. 838]; *Schwartz* v. *Schwartz,* 5 Cal.App.3d 141, 142 [85 Cal.Rptr. 49].)

[3] It is noted that the pleadings give no hint of any alleged agreement relating to an office structure. Plaintiff makes little of this, however, and neither do we.

evidence rule applied and that oral testimony was therefore inadmissible to vary the terms of the lease. Relevant provisions of the lease are set forth in the discussion.

A second problem raised at the trial was property taxes. Defendant was obligated to pay property taxes when due. It failed to pay taxes for the fiscal year 1972-1973, the first installment of which had become due in December 1972, about a month before the trial. The receiver had taken possession in November 1972. Defendant contended it was entitled to a proration of taxes for the balance of 1972. The court did not prorate the taxes in the findings and conclusions or in the judgment.

The court made findings of fact and conclusions of law, which are discussed below.

## DISCUSSION

### Parole Evidence Rule

Defendant contends the trial court erred in not permitting extrinsic evidence concerning the alleged agreement to modify the lease and the alleged mutual mistake.

The lease was divided into 16 numbered and captioned articles, and into numerous numbered and captioned sections within the articles. ██ ██ It provided that the "article headings in this lease are for convenience only and are not to be construed as part of the lease or in any way limiting or amplifying the provisions hereof."[4]

The lease provided, in relevant part:

First, it "is the intent of Lessor [plaintiff] and Lessee [defendant] that the rent herein specified . . . shall be absolutely net to Lessor, . . . All costs, expenses and obligations of every kind and nature . . . shall be paid by Lessee, and Lessor shall be indemnified . . . against all such costs."

Second, no "abatement, diminution or reduction of the rent or any additional rent shall be allowed to Lessee for any inconvenience, interruption, cessation or loss of business caused, directly or indirectly, by any present or future laws . . . war . . . strikes or any manner or thing resulting therefrom or by any other cause or causes, nor shall this lease be affected by any such causes."

---

[4] This provision negates defendant's contention that the alleged oral agreement concerning structural changes is not inconsistent with the lease provisions because the headings refer to rent, repairs, defaults and compliance with laws, and not to structural changes.

Third, the lessee, "at its sole expense," shall make all repairs, replacements and renewals, whether ordinary or extraordinary, seen or unforeseen, including all structural repairs, necessary to maintain the leased premises. . . . The Lessor shall in no event be required to make any repairs, alterations or improvements to the leased premises."

Fourth, the lessee "shall have the right to make changes or alterations in the building located on the leased premises, or to construct improvements on the leased premises. . . ." The lessee may not make any alterations "which will convert the building . . . into a structure which is not a complete, self-contained operating unit, or to some structure other than a parking garage, . . . . "[¶] All buildings, additions . . . shall immediately become . . . the property of Lessor. . . . "[¶] *The Lessor shall in no event be required to make any alterations, rebuilding, replacement, changes, additions or improvements or repair during the term of this lease.*" (Italics added.)

The lease provided that if defendant lessee defaulted, plaintiff could either end the lease or hold defendant to the lease and rerent the property for defendant's account.

Both the most cursory and the most detailed examination of the lease reveal that the collateral agreement or understanding claimed by defendants flatly contradicts the terms of the lease, which obligates the lessor to do nothing at all with respect to repairs or rebuilding and obligates the lessee to pay $18,333 rent a month without any excuses whatsoever.

Thus, defendant's reliance on *Masterson* v. *Sine*, 68 Cal.2d 222 [65 Cal.Rptr. 545, 436 P.2d 561], is quite misplaced. Although *Masterson*, according to the dissenting opinion, just about abrogated the parol evidence rule (68 Cal.2d at p. 237 and fn. 7), the majority did not think so and even a most generous reading of the case would not permit extrinsic evidence here.

The "crucial issue" in determining whether a written contract is "a complete and final embodiment of the terms of an agreement" is "whether the parties intended their writing to serve as the exclusive embodiment of their agreement. The instrument itself may help to resolve that issue. It may state, for example, that 'there are no previous understandings or agreements not contained in the writing,' . . . . Any such collateral agreement must itself be examined, however, to determine whether the parties intended the subjects of negotiation it deals with to be included in, excluded from, or otherwise affected by the writing." (68 Cal.2d at pp. 225-226.)

"The requirement that the writing must appear incomplete on its face has been repudiated in many cases where *parol evidence was admitted* 'to prove the existence of a separate oral agreement *as to any matter on which the document is silent and which is not inconsistent with its terms'* —even though the instrument appeared to state a complete agreement. [Citations.]" (*Id.*, at p. 226. Italics added.)

"Evidence of oral collateral agreements should be excluded only when the fact finder is likely to be misled. The rule must therefore be based on the credibility of the evidence." (*Id.*, at p. 227.)

One standard permits proof a collateral agreement which " 'might *naturally* be made as a separate agreement by parties situated as were the parties to the written contract.' " (*Id.*, at pp. 227-228 [italics in original].) Another standard would allow proof in fewer situations: " 'If the additional terms are such that, if agreed upon, they would *certainly* have been included in the document . . . then evidence of their alleged making must be kept from the trier of fact.' " (*Id.*, at p. 228. Italics in original.)

Thus, even under *Masterson*, the trial court properly refused defendant's offer to prove a collateral agreement that, first, totally contradicted the written lease; second, dealt with a matter on which the lease was explicit —the effect of loss of business on the lease; third, "would *certainly* have been included in the document itself"—since that document on its face, imposes an ironclad obligation on defendant for 25 years; and, finally, for the same reason, would not "*naturally* be made as a separate agreement," since it leaves nothing of the pertinent clauses of the written agreement.

Defendant relies on *Masterson* for the language that the parties might demonstrate their intent that the agreement be all-encompassing "for example," by including a no-previous-agreements clause in the document. (68 Cal.2d at p. 225.) The "example" was, necessarily, not intended to be the sole means by which parties to a contract could indicate a complete agreement. Indeed, a lease which provides for a specified rental "without any deduction or offset whatsoever," and with no "abatement, diminution or reduction of the rent" for any cause should not require a written statement to the effect that the parties are serious.

 Nor is defendant helped by its attempt to recast the argument in terms of "mutual mistake." The mistake which defendant was prevented from proving consisted of a mistaken belief that the office structure would be built, coupled with mistaken mutual assumptions that parking business on Spring Street would justify the rent reserved in the lease.

As to the first mistake—the building of an office structure—it is clear that defendant is simply recasting an unprovable contract in terms of a mutual expectation. It surely was not contemplated that the structure would materialize out of nothing.

As to the second mistake—business conditions on Spring Street—that seems to be the classical "collateral" mistake, which is merely a matter of inducement. (See Civ. Code, § 1577; *Bellwood Discount Corp.* v. *Empire Steel Buildings Co.,* 175 Cal.App.2d 432, 435 [346 P.2d 467]; *Roller* v. *California Pacific Title Ins. Co.,* 92 Cal.App.2d 149, 156 [206 P.2d 694].) If mistaken assumptions of prosperity can avoid contracts, few business agreements would survive an unexpected depression.

*Williams* v. *Puccinelli,* 236 Cal.App.2d 512 [46 Cal.Rptr. 285], relied on by defendant is quite beside the point. There, it was undisputed that both the lessor and the lessee intended that the leased premises be used as a restaurant and bar. Unknown to the parties, this could not be done without substantial structural alterations to the building. (236 Cal.App.2d at pp. 513, 516.) The lease provided that the lessee was responsible for repair and improvements to the portion leased, but the alterations required involved other parts of the building. (*Id.,* at p. 515.) The appellant lessor, however, adamantly refused to do any of the work which would have made the leased premises suitable for the mutually contemplated use.

In *Williams* the mistake related to the very subject matter of the lease— the suitability of the premises for the contemplated purpose. Here it relates only to the profitability of the lease in view of the agreed-on rent.

### Forfeiture of Lease—Proration of Taxes

Referring to plaintiff's failure to declare a forfeiture of the lease in its notice to quit, as well as to its failure to pray for such a forfeiture, the trial court concluded that the lease was not terminated "by this action."[5] The judgment itself simply said nothing about a forfeiture.

Defendant does not—indeed cannot—complain about the court's failure to forfeit its lease in this unlawful detainer proceeding. It does, however, make an argument with respect to the proration of real property taxes for the period November 17 to December 31, 1972, which is predicated

---

[5]"That the lease has not been terminated or forfeited by this action in that Plaintiff's complaint does not pray that the lease be forfeited, the three day notice to quit or pay rent did not declare the lease forfeited, and the provisions . . . of the lease specifically entitles Plaintiff to recover possession upon the breach thereof by Defendant, and to relet or attempt to relet the premises or any part thereof, for the account of Defendant, without terminating the lease or Defendant's liability thereunder."

on the premise that by causing a receiver to be installed on the premises on the earlier date, plaintiff must have caused a termination of the lease. In support of its argument defendant refers us to the fact that the damages awarded plaintiff did not include rent apportionable to the period when the receiver was in possession. The damages did, however, include the installment of taxes which became delinquent on December 10, 1972, which installment covered the period July 1 to December 31, 1972.

*Telegraph Avenue Corp.* v. *Raentsch*, 205 Cal. 93, 99-101 [269 P. 1109, 61 A.L.R. 366], holds that under certain circumstances the lessor, by causing a receiver to be appointed, evicts the tenant and thus terminates liability for rent. (See also *Garfinkle* v. *Montgomery*, 113 Cal. App.2d 149, 153 [248 P.2d 52].)

In this case, the court never found that the installation of the receiver terminated the lease. It merely found that plaintiff was not entitled to any rent after November 17. That finding appears to be the result of a concession by plaintiff during oral argument, rather than one which the court felt compelled to make as a matter of law. We certainly cannot say that the court was so compelled: the moving papers which caused the appointment of the receiver are not before us. The court's refusal to prorate taxes is therefore not legally inconsistent with its failure to award rent after November 17.[6]

The judgment is affirmed.

Ashby, J., and Hastings, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 27, 1974.

---

[6]The court did state that if any apportionment of the taxes was to be made, "it will be made at the time the receiver settles his accounts with the respective parties." Defendant states that if we looked at the superior court file we would discover that this never happened. We have not looked, but assume it would show what defendant says it would. Apparently, the receiver settled sometime after the judgment appealed from. If defendant was entitled to a credit it did not receive, it should have appealed from the order approving the receiver's account. (See fn. 2, *supra.*) Its failure to do so does not retroactively make the judgment under consideration erroneous.