[No. H000734. Sixth Dist. Mar. 16, 1987.]

SUSAN GERDLUND et al., Plaintiffs and Respondents, v. ELECTRONIC DISPENSERS INTERNATIONAL, Defendant and Appellant.

[No. H001058. Sixth Dist. Mar. 16, 1987.]

SUSAN GERDLUND et al., Plaintiffs and Appellants, v. ELECTRONIC DISPENSERS INTERNATIONAL, Defendant and Respondent.

**COUNSEL**

Brian M. O'Dea and Spinetta, Randick & O'Dea for Defendant and Appellant and Defendant and Respondent.

Michael T. Morrissey, Kurahara, Morrissey & Street and Kurahara & Morrissey for Plaintiffs and Respondents and Plaintiffs and Appellants.

## OPINION

**BRAUER, J.**—Plaintiffs Leroy Gerdlund and Susan Gerdlund filed suit against Electronic Dispensers International (EDI) claiming that EDI breached a written agreement by terminating them as sales representatives without good cause. Prior to trial EDI brought an *in limine* motion seeking to exclude evidence of oral representations made by EDI to the Gerdlunds that they would not be terminated as long as they performed well. Following an evidentiary hearing, the court denied EDI's motion and the matter proceeded to trial. A jury rendered a verdict in favor of the Gerdlunds and awarded them $287,573 in damages. On appeal EDI claims that the judgment must be reversed because the court erred in admitting parol evidence which contradicted the terms of the written contract. Our review of the cases interpreting the parol evidence rule leads us to the same conclusion. We therefore reverse the judgment.

The Gerdlunds have appealed separately from an order determining costs (Civ. No. H001058), contending that the trial court abused its discretion in setting the date from which to calculate prejudgment interest. On our own motion we have ordered consolidation of the two appeals. Our reversal of the judgment in favor of the Gerdlunds renders their ancillary appeal moot. Accordingly we will dismiss appeal No. H001058 and direct that the trial court vacate the order appealed from.

### FACTS

The following facts are not in dispute.

EDI manufactures bar dispensing equipment. Leroy Gerdlund started work as an independent sales representative for EDI products in 1967 and began to develop a territory consisting of California, Arizona, and Nevada. From 1970 to 1973 he worked for EDI as director of marketing and also acted in the capacity of manager of sales for the three-state area.

In 1973 Gerdlund returned to full-time sales work in the field. He was joined by his wife, Susan, and together they formed S & L Sales, a partnership (S & L). The two continued to develop a market for EDI products. By 1975 their territory had expanded to include Utah, Colorado and New Mexico.

Although Leroy had worked under various representative agreements with EDI over the years, the first agreement between S & L and EDI was the "Representative Agreement" in question here (the agreement), dated January 1, 1975. The agreement was signed by the Gerdlunds and by Wayne Easley, president of EDI and Jay Kegerreis, its marketing manager. We quote

here the pertinent portions of the agreement: "11. EFFECTIVE PERIOD: TERMINATION [¶] This agreement shall be effective until thirty (30) days after notice of termination given by either party. Notice of termination may be given at any time and for any reason, and the date of any such notice shall be the postmark date if mailed, or the transmission date if wired. . . . [¶] 13. THE AGREEMENT COMPLETE. [¶] This agreement contains the entire agreement between the Company and the Representative. There are no oral or collateral agreements of any kind. . . ."

Relations between S & L and EDI were smooth until September of 1976. At a meeting during a trade show held in San Francisco the second week of September, EDI announced to its assembled sales people that their contracts were terminated pending negotiation of new agreements based upon an altered commission structure. Either at this meeting or shortly thereafter through the mail, all EDI representatives including the Gerdlunds received a letter dated September 15, 1976, which confirmed the termination of all existing agreements, and a draft of a new agreement, dated October 15, 1976.

The Gerdlunds were unhappy with several aspects of the proposed agreement. Over the following two months they and EDI attempted to negotiate an agreement that would be acceptable to both sides. During this time the Gerdlunds continued full-time work for the company. They were told that they were in no danger of losing their jobs; the termination announced on or about September 15 was merely a formality in order that a new commission structure could be worked out. Eventually negotiations broke down and at a meeting with Easley and Kegerreis on November 19, 1976, the Gerdlunds were told they were terminated as sales reps for EDI as of that day.

During the course of their affiliation with EDI the Gerdlunds were repeatedly given assurances by Easley that as long as they did a good job the territory would be theirs. There was no question but that they did do a good job. During the early years Gerdlund barely made expenses and expended considerable personal time and money in the process of building a customer base for EDI products in the western states. EDI's sales rose dramatically in the western territory from 1967 to 1976, in large part as a result of the Gerdlunds' efforts. The Gerdlunds were consistently the top performers for EDI. According to Leroy Gerdlund, S & L accounted for approximately 25 percent of EDI's total U.S. sales of $4.7 million in 1976. S & L's projected earnings for that year were $107,963.

Two experts testified at trial, giving widely divergent opinions of the market value of S & L sales as of January 1977, based on the 1976 earnings

figure of $107,963. The Gerdlunds' expert estimated the value of S & L at $401,714; EDI's expert found the value to be approximately $35,000.

The case was tried on two causes of action: 1) breach of the written agreement, incorporating both the express oral representations and the implied covenant of good faith and fair dealing; and 2) fraudulent misrepresentation against Wayne Easely individually. The jury found that EDI had breached the employment agreement and assessed damages in the amount of $287,573. The jury also found that no fraud had been committed by Easley.

ISSUES

The principal issue presented by this appeal is whether evidence of the oral representations made by EDI should have been barred by the application of the parol evidence rule. EDI also raises the following points: 1) the agreement should be interpreted according to Nevada law; 2) the trial court erroneously instructed the jury on the legal effect of the parol evidence rule; 3) the trial court erroneously instructed the jury on the covenant of good faith and fair dealing; and 4) the parol evidence was inadmissible to prove fraud on the part of Easley. Judgment in favor of Easely precludes the necessity of addressing this last issue. Since we reverse on the basis that the parol evidence should not have been submitted to the jury, we do not find it necessary to address the claimed instructional error in regard to this evidence. We will comment briefly on the matter of the choice of law before turning to our analysis of the parol evidence rule and the related issue of the implied covenant of good faith and fair dealing.

*Governing Law*

The agreement contained the following provision: "15. GOVERNING LAW. . . This agreement shall be governed by and interpreted in accordance with the laws of the State of Nevada."

As a general rule in California contracting parties may specify what law is to control their contract, as long as there is a reasonable basis for that choice and the law chosen does not contravene a strong public policy of California. (*Gamer* v. *DuPont Glore Forgan, Inc.* (1976) 65 Cal.App.3d 280 [135 Cal.Rptr. 230].)

EDI is a Nevada corporation with headquarters in Reno. The territory of S & L sales included the State of Nevada. There is no doubt that the parties had a substantial relationship with that state.

While we do not question the validity of the choice of law provision, we fail to see how application of Nevada law would make the slightest difference

here, since, as EDI readily concedes, "the parol evidence rule as applied by the State of Nevada is consistent with the rule as applied in the State of California." Furthermore, EDI bases its argument here primarily on California cases, as do the Gerdlunds. Since there is no apparent conflict in the law, and no conceivable prejudice to either party, we will decide the case on the basis of California law.

### The Parol Evidence Rule

First we note that where, as here, the trial court's interpretation of the agreement did not turn on the credibility of extrinsic evidence and did not require a resolution of a conflict in that evidence, we are not bound by the result below and must make our own independent determination. (*Delucchi* v. *County of Santa Cruz* (1986) 179 Cal.App.3d 814, 820 [225 Cal.Rptr. 43].)

The parol evidence rule generally prohibits the introduction of any extrinsic evidence to vary or contradict the terms of an integrated written instrument. (Code Civ. Proc., § 1856.) It is based upon the premise that the written instrument *is* the agreement of the parties. (*Tahoe National Bank* v. *Phillips* (1971) 4 Cal.3d 11, 22-23 [92 Cal.Rptr. 704, 480 P.2d 320].) Its application involves a two-part analysis: 1) was the writing intended to be an integration, i.e., a complete and final expression of the parties' agreement, precluding any evidence of collateral agreements (*Masterson* v. *Sine* (1968) 68 Cal.2d 222 [65 Cal.Rptr. 545, 436 P.2d 561]); and 2) is the agreement susceptible of the meaning contended for by the party offering the evidence? (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].)

A determination of admissibility under the parol evidence rule requires that the court attempt to place itself in the same situation in which the parties found themselves at the time of contracting. (*Id.*, at p. 40.) In order to do this it must provisionally receive all evidence offered to prove the intention of the parties, including evidence as to the circumstances surrounding the making of the agreement, and evidence with respect to the proffered collateral agreement itself. (*Ibid.*) In our case, the court did precisely this when it held an evidentiary hearing in advance of the trial.

In regard to the question of integration, the written agreement of the parties contained an expression of their intent that it supersede any and all other agreements between them and that it constitute their entire agreement. It specifically recited that "there are no oral or collateral agreements of any kind." Our Supreme Court held in *Masterson* v. *Sine, supra,* 68 Cal.2d 222 that such a clause, while it certainly helps to resolve the issue,

does not of itself establish an integration; the collateral agreement itself must be examined in order to determine whether the parties intended it to be a part of their bargain. ■ *Masterson,* however, does not go so far as to permit proof of a collateral agreement which contradicts an express provision of the written agreement. The reason for this is clear: it cannot reasonably be presumed that the parties intended to integrate two directly contradictory terms in the same agreement. Under *Masterson* then, parol evidence can be admitted only " 'to prove the existence of a separate oral agreement as to any matter on which the document is silent and which is not inconsistent with its terms ....' " (*Id.,* p. 226.)

The case of *Brawthen* v. *H & R Block, Inc.* (1972) 28 Cal.App.3d 131 [104 Cal.Rptr. 486], upon which the Gerdlunds rely, applied the *Masterson* test to facts similar to ours. In that case Brawthen was a branch manager of H & R Block and had built up a flourishing tax business over the course of five years. Much like Leroy Gerdlund, Brawthen worked largely without pay in the early years, devoting himself to the development of a client base in his area. He had a written employment agreement with Block which provided for automatic renewal from year to year "unless either party gives written notice of termination ninety days prior to renewal date." (*Id.,* at p. 134.) He was, however, given assurances at the time he signed the agreement, and from time to time thereafter, that if he did a good job in his area, renewal of the contract would be virtually guaranteed. At one point Block circulated a written memo to all branch managers which said this: "No manager need worry about his contract if he is doing a good, honorable conscientious job ...." As in our case, the company eventually sought to change the commission structure; when Brawthen refused to sign the proposed agreement, his contract was terminated.

The *Brawthen* court took the approach that the agreement was not integrated; therefore extrinsic evidence showing a collateral agreement between the parties was admissible. While we do not disagree with the result in *Brawthen,* we cannot apply the same analysis in our case. By any standard, the agreement before us is integrated. In the first place, unlike the agreement in *Brawthen,* it clearly states that it is integrated. ■ On this point the Gerdlunds argue that the collateral agreement with EDI falls within the following exception to the integration clause: "From and after the effective date of this agreement, any and all previously existing written or verbal agreements between the Company and the Representative ... are hereby and shall be terminated and at an end, *save and except as to any then existing obligations owing between the parties.*" (Italics added.) There is, however, no evidence to support the interpretation sought by the Gerdlunds, that "obligations owing" referred to EDI's promise to retain them as long as they performed well. In fact testimony by both sides was that this phrase referred only to outstanding commissions.

 Aside from the integration clause itself, there was evidence that Gerdlund actually helped to draft the entire agreement, including the termination clause, while employed by EDI in a management position; thus he cannot claim it to be a contract of adhesion. (See, e.g., *Fireman's Fund Ins. Co.* v. *Fibreboard Corp.* (1986) 182 Cal.App.3d 462 [227 Cal.Rptr. 203].) Further, the agreement was not a formalized document of the type described in *Masterson,* such as a deed or promissory note, which would not be expected to express the parties' entire understanding on its face. In fact, it ran to six pages and seemingly covered all aspects of the employment relationship.

Most important, however, is the following distinction: In *Brawthen* the court found that the termination clause, which simply provided that either party could give 90 days written notice, did not preclude a finding of an additional agreement regarding good cause for termination. In other words, such an agreement might "naturally" be made separately. (Rest., Contracts, § 240, subd. (1)(b), p. 335.) In our case, the contract provides that either party can give written notice of termination *for any reason.* Thus there is no room for a separate collateral agreement regarding reasons for termination; the precise subject is already covered in the writing. Any additional agreement would "certainly" have been included in paragraph 11. (U. Com. Code, § 2-202, com. 3.)

For these reasons we conclude that the agreement is integrated; consequently *Brawthen* does not apply here. Moreover, as discussed below, we find that the alleged oral agreement is completely inconsistent with the language of the written contract. Thus the proffered parol understanding as to grounds for termination would be inadmissible to vary the contractual terms even if the contract were *not* an integration. (*Masterson* v. *Sine, supra,* 68 Cal.2d at p. 229; *American Nat. Ins. Co.* v. *Continental Parking Corp.* (1974) 42 Cal.App.3d 260, 266 [116 Cal.Rptr. 801].)

 We now move on to the second part of our analysis: whether the offered evidence is nonetheless admissible to explain the meaning of the contractual language. This aspect of the parol evidence rule was stated by the Supreme Court in *Pacific Gas & E.* v. *G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d 33, 37: "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." "If the court decides, after considering [the] evidence, that the language of a contract, in the light of all the circumstances, 'is fairly susceptible of either one of the two interpretations contended for . . .' [citation], extrinsic evidence relevant to prove either of such meanings is admissible." (*Id.,* at p. 40, fn. omitted.)

Testimony by all parties at the *in limine* hearing was that all had the same general intent regarding the length of employment, namely that the Gerdlunds would not be terminated as long as they were doing a good job for EDI. On the basis of this evidence the Gerdlunds argued that the sentence which reads "Notice of termination may be given at any time and *for any reason*" should be interpreted to mean "for any *good* reason," in order to be consistent with the parties' stated understanding.

We do not find that the language of the contract lends itself to the proposed meaning. The term "any reason" is plainly all-inclusive, encompassing all reasons "*of whatever kind,*" good, bad, or indifferent. (Quoting Webster's Dict. definition of "any".) Adding the modifier "good" has a delimiting effect which changes the meaning entirely. As written the contract is one which is terminable at will; the interpretation sought by the Gerdlunds is that the contract is terminable only for good cause. The two are totally inconsistent. The trial court admitted the evidence on the ground that "both parties have testified as to what they interpreted the contract to mean." Testimony of intention which is contrary to a contract's express terms, however, does not give meaning to the contract: rather it seeks to substitute a different meaning. It follows under the *P.G. & E.* case that such evidence must be excluded.

Several cases will serve to illustrate this point. In *Blumenfeld* v. *R. H. Macy & Co.* (1979) 92 Cal.App.3d 38 [154 Cal.Rptr. 652], Blumenfeld assigned his interests in a shopping center to a group called REITA. The contract between the two provided that the assignment included "all assets and property related to the Center . . . and all claims against third parties relating to the Center." Blumenfeld introduced evidence to prove that this language was meant to include only claims against those tenants who presently occupied the center and therefore did not include his ongoing lawsuit against Macy's over an alleged promise to lease the key store space. Though the trial court had admitted Blumenfeld's proffered evidence, the Court of Appeal reversed, finding that "[t]he all-inclusive language of the agreement is not reasonably susceptible of the meaning advanced by Blumenfeld." (*Id.,* p. 46.)

*American Nat. Ins. Co.* v. *Continental Parking Corp., supra,* 42 Cal.App.3d 260 concerned the interpretation of a lease of a multilevel parking structure. The lease provided in part that the rent be "absolutely net" to the lessor and that no " 'abatement, diminution or reduction of the rent . . . shall be allowed . . . [for any] loss of business caused, directly or indirectly, by any present or future laws . . . or any manner or thing resulting therefrom or by any other cause or causes . . . .' " (*Id.,* at p. 264.) In addition it provided that the lessor not be required " 'to make any alterations, rebuilding, replacement, changes, additions or improvements or repair' " (*id.,* at p. 265) during the term of the lease. The lessee sought to introduce extrinsic evidence that at the time the

contract was entered into 1) both parties intended that the lease could be renegotiated if parking fees on the adjacent public street did not increase as contemplated, and 2) the lessor intended to build an office structure on top of the parking garage, thus creating a captive market. The court found that the claimed collateral understanding flatly contradicted the lease which allowed no rent reduction for *any* cause and imposed no requirement on the lessor to make *any* alterations or improvements. It was thus inadmissible under *Masterson* as well as *P. G. & E.*

The recent case of *Malmstrom* v. *Kaiser Aluminum & Chemical Corp* (1986) 187 Cal.App.3d 299 [231 Cal.Rptr. 820] is on all fours. It involved an employment contract which provided that employment was to continue "for such a length of time as shall be mutually agreeable" to the parties. (*Id.,* at p. 309.) Before signing the contract, and afterwards in the course of a transfer from California to Florida, Malmstrom was assured by the management of Kaiser that he would have the job as long as he performed satisfactorily. When he was terminated because of a general decline in business, he sued for breach of contract. The Court of Appeal affirmed a summary judgment in favor of Kaiser, saying this: " 'Giving the words "mutually agreeable" their general and ordinary meaning, the construction commanded by the language is inescapable—if either party no longer desires the employment to continue, the employment would no longer be "mutually agreeable" and could be terminated by the party desiring to do so. In short, either plaintiff or Kaiser had the right to unilaterally end the employment relationship. . . .' We hold that the contract is a contract for employment terminable at will and that, since the contract is integrated and provides that it supersedes all prior agreements, evidence of an implied agreement which contradicts the terms of the written agreement is not admissible." (*Id.,* at p. 316.)

Finally, we do not agree with the conclusion that the testimony by the parties as to their oral understanding indicates a mutual intention to ignore the terms of the written contract. While all parties may have expressed an expectation that the employment relationship be a continuing and profitable one, both Easley and Leroy Gerdlund were nonetheless aware of rights vested in them under the termination clause, as the following testimony demonstrates. "Q. [Mr. O'Dea, counsel for EDI] Mr. Easley, referring to, again, the termination provision, was it your intent when you drafted this agreement that you could terminate a representative for reasons sufficient to yourself?

"A. Yes.

"Q. Is it also your intent that a representative could terminate his relationship with you, E.D.I., for reasons sufficient to themselves?

"A. Yes.

"Q. Regardless of what the reason is you felt the representative had that right?

"A. Yes.

"Q. You also felt you had that right. Is that correct?

"A. Yes.

"Q. [Mr. O'Dea] I believe you testified that it was your understanding that the only time you would utilize paragraph eleven, that is the termination paragraph, was if a representative was not doing a good job. Is that correct?

"A. [Leroy Gerdlund] That is correct.

"Q. Did you discuss this with Mr. Easley?

"A. At what time?

"Q. At any time?

"A. In the beginning. Yes. When the contracts were written we had to have a clause in there that would allow us to terminate somebody if they weren't performing properly.

"Q. What about if E.D.I. wanted to change its method of marketing? Did you ever consider that?

"A. That would be just cause if they did across the board change in their marketing concept and principles. Yes.

"Q. Then even if a representative were doing a good job E.D.I. had the right to terminate, did they not?

"A. With thirty days proper notice. Yes.

"Q. Yes. That is what I am talking about, with thirty days notice.

"A. Right.

"Q. How about if E.D.I. wanted to change its commission structure—

"A. Of course.

"Q. —to differ from this agreement?

"A. That is correct.

"Q. It was your feeling they had a right to terminate this agreement, did they not?

"A. That is correct.

"Q. How about if a representative failed to agree with the terms of a subsequent agreement, do you feel E.D.I. had the right to terminate the agreement?

"A. Only if the representative refused to operate under those terms. Yes.

"Q. You do agree with that?

"A. Only if they refused to operate under those terms. That is correct.

"Q. So that there were, in fact, at least you believed there were other causes other than the fact the representative was not doing a good job, isn't that correct, that E.D.I. could terminate them?

"A. It is possible. Yes."

In summary we find that the employment contract represents the complete agreement between EDI and S & L Sales and that the language of the termination clause contained therein does not reasonably lend itself to the meaning advanced by the Gerdlunds. ▮ "[I]n determining whether substantial evidence supports a judgment, extrinsic evidence inconsistent with any interpretation to which the instrument is reasonably susceptible becomes irrelevant; as a matter of substantive law such evidence cannot serve to create or alter the obligations under the instrument. Irrelevant evidence cannot support a judgment." (*Tahoe National Bank* v. *Phillips, supra,* 4 Cal.3d 11, 23, fn. omitted.)

*Implied Covenant of Good Faith and Fair Dealing*

▮ While our ruling on the admissibility of the extrinsic evidence requires reversal, we will comment here briefly on a closely related issue,

namely whether the court's instruction to the jury regarding the covenant of good faith and fair dealing was error.

The instruction given was this: "There is an implied covenant of good faith and fair dealing in any contract you may find to exist in this case, but [*sic*] neither party will do anything which will injure the rights of the other to receive the benefits of the agreement."

EDI contends that it was reversible error to invite the jury to apply an implied covenant of fair dealing to override an express provision of the contract. We agree.

The covenant of good faith and fair dealing implied in every contract has been held in certain special cases to supply a requirement of good cause for termination where the contract itself is silent or ambiguous on that subject. (See, e.g., *Wallis* v. *Superior Court* (1984) 160 Cal.App.3d 1109, 1116 [207 Cal.Rptr. 123]; *Cleary* v. *American Airlines, Inc.* (1980) 111 Cal.App.3d 443 [168 Cal.Rptr. 722].) No obligation can be implied, however, which would result in the obliteration of a right expressly given under a written contract. "There cannot be a valid express contract and an implied contract, each embracing the same subject, but requiring different results." (*Shapiro* v. *Wells Fargo Realty Advisors* (1984) 152 Cal.App.3d 467, 482 [199 Cal.Rptr. 613].)

In the case of *Sherman* v. *Mutual Benefit Life Ins. Co.* (9th Cir. 1980) 633 F.2d 782, an insurance agent sued for breach of the implied covenant of good faith and fair dealing, after he had been terminated pursuant to the provisions of the termination clause in the employment agreement. In affirming the dismissal of this claim the court, applying California law, said this: "Sherman maintains that even if the agency agreement was intended to be terminable without cause, California law nonetheless creates an implied covenant of good faith and fair dealing in the performance of contracts. However, under an 'at-will' employment contract, '[California] courts have consistently held that in such a confidential relationship, the privilege [of termination] is absolute, and the presence of ill will or improper motive will not destroy it. . . .' " (*Id.,* at 786, quoting *Marin* v. *Jacuzzi* (1964) 224 Cal.App.2d 549, 553 [36 Cal.Rptr. 880].)

" '[W]hat that duty [of good faith] embraces is dependent upon the nature of the bargain struck between [the parties] and the legitimate expectations of thr parties which arise from the contract.' . . . [¶] Few principles of our law are better settled, than that '[t]he language of a contract is to govern its interpretation, if the language is clear and explicit. . . .' " (*Brandt* v. *Lockheed*

*Missiles & Space Co.* (1984) 154 Cal.App.3d 1124, 1129-1130 [201 Cal.Rptr. 746], italics omitted.)

Since the breach claimed by the Gerdlunds related only to the termination provision, it was error to instruct the jury to apply a good faith covenant at variance with this provision.

We reverse the judgment and direct that judgment be entered for defendant Electronic Dispensers International. We dismiss appeal No. H001058 and direct that the order appealed from be vacated. Plaintiffs are to bear costs of both appeals.

Agliano, P. J., and Capaccioli, J., concurred.

A petition for a rehearing was denied April 6, 1987, and respondents' petition in No. H000734 for review by the Supreme Court was denied June 18, 1987.