Peter TRAUMANN and Marsha Traumann, Plaintiffs,

v.

The SOUTHLAND CORPORATION, a Texas Corporation; et al., Defendants.

No. C–92–4548 FMS.

United States District Court, N.D. California.

July 20, 1993.

**388**

Adrienne M. Moran, Shapiro, Galvin & Shapiro, Santa Rosa, CA, for plaintiffs.

Charles G. Miller, Ralph J. Sutton, Bartko Tarrant & Miller, San Francisco, CA, for defendant.

## ORDER GRANTING SUMMARY JUDGMENT IN PART AND DENYING IN PART

FERN M. SMITH, District Judge.

### BACKGROUND

In late August or early September of 1991, Peter and Marsha Traumann ("the Traumanns"), a married couple, wrote to the Southland Corporation ("Southland") to enquire about applying for a franchise of a 7–Eleven store in California. Southland sent the Traumanns application materials to fill out. The Traumanns did so, and thus began the application process for a ten year franchise of a 7–Eleven store.

On October 21, 1991, the Traumanns met with Michael Sweet ("Sweet"), a Field Consultant for Southland. Sweet was assigned to the Traumanns by Southland, and was responsible for overseeing their progress through the qualification process.

At this first meeting, Sweet presented the Traumanns with several documents and charts created by Southland which summarize the information a prospective franchisee needs to know about the Southland system. The Traumanns received "Flip Book I" and "Flip Book II" which are given to all franchise applicants. Flip Book I outlines the requirements for certification as a Southland franchisee: franchisees must successfully complete all aspects of the formalized four week training program, and they must also complete all other requirements for qualification, including certification, which occurs upon successful completion of the entire training program. Flip Book II contains more detailed cautionary language regarding disqualification and certification:

> If 7–Eleven discontinues your attendance or does not certify you or revokes your certification, which it may do, 7–Eleven will refund, without interest:
>
> \* The down payment (less any amount due 7–Eleven);
>
> \* The franchise fee.

The Traumanns moved forward with the certification process following their meeting with Sweet. As part of the qualification process, applicants participate in an introductory 100 hour In–Store program, take a psychological and personality test, submit a business plan, tender their franchise fee, sign a franchise agreement and, finally, participate in four weeks of store operations training before taking possession of their own store. During this time, applicants are in constant touch with their Field Consultant.

In the course of the qualification process, the Traumanns received sample copies of the Franchise Agreement. All such copies contain explicit language in Paragraph 3, which states in part:

> 7–Eleven at any time may discontinue training, may decline to certify, or may revoke the certification of any participant who fails to evidence an understanding of the training satisfactory to 7–Eleven, or otherwise by acts or omissions, at any time prior to the Effective Date, is, in any way unsatisfactory to 7–Eleven.

The "Effective Date" referred to in Paragraph 3 is defined in the Agreement as "the date [the] Franchisee first opens the store for business under the Agreement."

On February 5, 1992, the Traumanns met with Sherry Chaplin ("Chaplin"), a Market

Manager for Southland. This meeting is often called the "Go/No Go" meeting because the Market Manager has the discretion to approve or discontinue the franchising process at this point. The meeting went well, and the Traumann's application received a "Go" from Chaplin.

Shortly after the meeting, Sweet received a memo from Chaplin indicating that the Traumanns had been approved to proceed with the qualification process to take over an existing franchise in Petaluma, California. Sweet called the Traumanns to relay the good news. The substance of Sweet's phone call is disputed by the parties. Southland claims that Sweet notified the Traumanns that they had received a "Go," and that they had been approved for the Petaluma Store, up to that point in the process. Plaintiffs claim that Sweet told them during this phone call that they had been accepted, the store was theirs, and that the only ones who could back out of the deal now were the Traumanns themselves. According to Southland, Sweet merely informed the Traumanns that they had reached an important and necessary juncture in their qualification process, with many important steps still to come.

At this time, the Traumanns again reviewed a copy of the Franchise Agreement. They asked Sweet to clarify the Agreement language which described Southland's right to disqualify potential franchisees. The Traumanns claim that Sweet told them not to worry about the disqualification provision, that the training was just a "formality," and that if either of them failed the training, Southland would franchise the passing spouse and allow the other one to retake the training. Sweet claims that he did reassure them that he felt sure they would pass, but did not promise that they could re-take the course. Sweet notes that he understood Mr. Traumann to be concerned about the bookkeeping aspects of the store training, and that they never discussed the possibility that the Traumanns might be disqualified during training for subjective reasons, such as attitude or an inability to work with others.

On February 28, 1992, the Traumanns went to the Southland offices and signed the Franchise Agreement. At the time the Traumanns signed the Agreement, Assistant Secretary Jerry Hook's signature was already on several of the contract pages. Included was a financing agreement, also signed by Jerry Hook, which acknowledged that Southland had entered into a contract with the Traumanns.

After the Agreement was signed, Sweet handed the Traumanns a letter signed by Chaplin which welcomed the Traumanns to the 7–Eleven Franchise system. The letter stated in part: "I would like to extend my congratulations on your acceptance as the Franchisee of the above referenced 7–Eleven store." At this time, Sweet also told the Traumanns to begin hiring employees. Because of Sweet's statements and Chaplin's letter, the Traumanns were under the impression that they had been finally accepted by Southland as of this date.

Sweet arranged for the Traumanns to begin their four week store training in the first week of March, 1992. The Traumanns completed three of these weeks. On March 24, 1992, the second day of the final week, however, the Traumanns received a letter signed by Sweet and Chaplin, informing them that Southland had "elected" to discontinue the franchising process with them. The Traumanns were not informed at that time of the basis of Southland's election; a week later they discovered that they had been evaluated as having antisocial personality traits unsuited to successful Southland franchisees.

The Traumanns have sued Southland for breach of contract and negligent and intentional misrepresentation, among other things. In this motion, Southland seeks partial summary judgment as to the Traumanns' claims that Southland breached the contract by terminating them, that Southland employees fraudulently misrepresented the contract to them, and that Southland breached the implied covenant of good faith and fair dealing by abusing its discretionary power to terminate their contract. Southland asserts that the parol evidence rule excludes all evidence of Plaintiffs' alleged "final acceptance" by Southland.

## ANALYSIS

1. *The applicable standard.*

A. *Summary judgment*

Federal Rule of Civil Procedure 56 provides for partial or complete summary judg-

ment where no genuine issue of material fact exists. In examining a summary judgment motion, the Court must view all evidence presented in the light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. *The parol evidence rule*

■ The parol evidence rule prohibits the introduction of oral or written evidence to vary or contradict the terms of an integrated written contract. *Masterson v. Sine,* 68 Cal.2d 222, 65 Cal.Rptr. 545, 436 P.2d 561 (1968). The rule is based on the premise that the written agreement constitutes the final and absolute expression of the result of all negotiations. *Gerdlund v. Electronic Dispensers Int'l,* 190 Cal.App.3d 263, 235 Cal. Rptr. 279 (1987).

■ The parol evidence rule will only apply to exclude extrinsic evidence if the contract at issue is integrated. The question of whether the parties intended the written instrument to be an integration, i.e., the complete and final expression of their agreement, is one of law for the Court. *FPI Development, Inc. v. Nakashima,* 231 Cal.App.3d 367, 282 Cal.Rptr. 508 (1991). A court must not only consider "whether the written instrument contains an integration clause, but also examine the collateral agreement itself to determine whether it was intended to be part of the bargain." *Wagner v. Glendale Adventist Medical Center,* 216 Cal.App.3d 1379, 1386, 265 Cal.Rptr. 412 (1989). The integration analysis examines such prior or contemporaneous representations only if they do not directly contradict the express terms of the written agreement. *Gerdlund,* 190 Cal.App.3d at 271, 235 Cal.Rptr. 279.

### 2. *The parol evidence rule is applicable here.*

#### A. *The Franchise Agreement is an integrated contract.*

■ The Franchise agreement contains an integration clause. It reads, in relevant part:

*Complete Agreement.* This agreement, any other agreements specified in Exhibit D, and the Exhibits, Amendments, and Addenda (which are incorporated herein by this reference and made a part of this Agreement) contain all Agreements between Franchisee and 7–Eleven and cover their entire relationship concerning the Store, all prior or contemporaneous promises, representations, agreements or understandings being expressly merged or superseded.

The presence of such a clause is strong evidence of the parties' intent, although it is not dispositive. *Slivinsky v. Watkins–Johnson Co.,* 221 Cal.App.3d 799, 270 Cal.Rptr. 585 (1990).

The Traumanns argue that, despite the integration clause, the contract should not be found to be integrated because surrounding circumstances and conduct of the parties must also be considered. They have not, however, cited any cases in which a contract which contained an integration clause such as the one here was found to be unintegrated. In addition, the Traumanns had read the entire Franchise Agreement several times before signing it. They had encountered the integration clause on each reading. The Traumanns are held to having agreed to both the integration clause and Paragraph 3 by signing the contract.

The Traumanns' claims do not fall under an exception to the parol evidence rule. Although parol evidence may be introduced to show the meaning of the express terms of an integrated contract, "there must be reasonable harmony between the parol evidence and the integrated contract for the evidence to be admissible." *Brinderson–Newberg v. Pacific Erectors,* 971 F.2d 272, 277 (9th Cir. 1992). In this case, the Traumanns seek to use parol evidence to directly contradict the terms of the written contract. This evidence is inadmissible under California's interpretation of the parol evidence rule.

■ Nor do the Traumanns have a claim for equitable estoppel. They have not relied

to their detriment on the representations of Sweet or Chaplin. Instead, they proceeded with the same application process they would have had they never received any assurances regarding their acceptance. Thus, no equitable reason exists to allow admission of Plaintiffs' evidence.

Because the Franchise Agreement was an integrated and final statement of the agreement between the parties, the parol evidence rule bars the court from considering prior oral statements made to the Traumanns regarding the effect of the various clauses contained within the contract.

B. *Chaplin's February 28, 1992 letter was not a valid modification or waiver of the Franchise Agreement.*

 The parol evidence rule does not operate to exclude evidence of subsequent negotiations to show modification of the contract. The Traumanns claim that the letter they received on February 28, 1992 was a valid written modification of their contract with Southland. This letter was handed to the Traumanns following their signing of the Franchise Agreement. The letter was signed by Chaplin, and congratulated the Traumanns on their acceptance as Franchisees. The Traumanns claim that this letter evidenced a modification to the agreement such that their acceptance by Southland became irrevocable.

The February 28, 1992 letter is not a valid written modification to the contract for several reasons. First, although the Franchise Agreement does allow for written waivers, it clearly states that such waivers may only be executed by Assistant Secretaries of Southland:

No agent, or Employee of 7–Eleven is authorized to make any modification, addition or amendment to or waiver of this Agreement unless in writing and executed by an Assistant Secretary of 7–Eleven.

The Traumanns had met with Sherry Chaplin before and were aware of her position as Marketing Manager. As noted above, the Traumanns were familiar with the Franchise Agreement before signing it and were on notice that it could not be modified except by an Assistant Secretary. The Traumanns

have offered no evidence to show that Chaplin had either actual or ostensible authority to modify or waive any part of Southland's written contract. Regardless of what the Traumanns thought the letter meant, Ms. Chaplin did not have the authority to modify the agreement in the manner that the Traumanns are claiming.

Neither Chaplin nor Southland intended the February 28, 1992 letter to be a waiver of Southland's right to terminate the Traumann's application at any time up to the Effective Date. To be valid, a waiver "must be a clear expression made with a full knowledge of the fact[s] and an intent to waive the right." *Spellman v. Dixon,* 256 Cal.App.2d 1, 63 Cal.Rptr. 668 (1967). Chaplin's letter does not state that it was intended as a waiver or modification, makes no reference to the Franchise Agreement at all, does not set forth a modification of particular terms, and recites no new consideration. In addition, Plaintiffs have offered no evidence other than the existence of the letter that it was intended to be a modification or waiver. Thus, the February 28, 1992 letter was not a modification of the contract.

3. *The parol evidence rule bars consideration of the Traumanns' fraud claims.*

 The Traumanns' fraud claims are barred by the parol evidence rule. Under California law, "if the false promise relates to the matter covered by the main agreement and contradicts or varies the terms thereof, any evidence of the false promise directly violates the parol evidence rule and is inadmissible." *Price v. Wells Fargo Bank,* 213 Cal.App.3d 465, 484, 261 Cal.Rptr. 735 (1989). The Traumanns allege that Sweet's and Chaplin's promises directly contradicted the written terms of the contract. Evidence relating to this claim is barred by the parol evidence rule.

4. *The parol evidence rule does not bar consideration of the Plaintiffs' claims of breach of the implied covenant of good faith and fair dealing.*

 This claim does not fail on this summary judgment motion. The Traumanns al-

lege that Southland breached their duty to the Traumanns not only through the allegedly false representations by Sweet and Chaplin, but also by wrongfully exercising its discretionary power in terminating the Traumanns' contract. There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement. *Comunale v. Traders & General Ins. Co.*, 50 Cal.2d 654, 328 P.2d 198 (1958). The duty which arises from the covenant of good faith and fair dealing is "unconditional and independent in nature; it is not controlled by events in the same manner as conditions precedent or subsequent." *Cleary v. American Airlines, Inc.*, 111 Cal.App.3d 443, 453, 168 Cal.Rptr. 722 (1980). At the time the Traumanns' application was terminated, they had entered into a contract with Southland. Final ratification of the contract by Southland was subject to the condition precedent of the Traumanns' satisfactory completion of the four week training. Although Southland had complete discretion to terminate the Traumanns' application, it was still bound to exercise this discretionary power in good faith.

Examining the facts in the light most favorable to the Traumanns, they have alleged facts sufficient to withstand Southland's motion for summary judgment: the Traumanns had been in constant contact with various representatives of Southland for at least five months when their application was terminated, had completed all but four days of the required application process, had taken personality tests, had tendered their franchise fee, and had been told by Southland to begin hiring employees. The Traumanns reasonably expected to get the franchise at the end of the week in which their application was terminated. It is hard to understand why, if the Traumanns have such antisocial personalities, this fact was not discovered by one of Southland's employees prior to March 24, 1992. In addition, the Traumanns were given no warning that their performance was not acceptable, and were not even informed of the reason for their termination until one week after they were dismissed. Based on these facts, the Traumanns should have an opportunity to try to prove that Southland breached the implied covenant of good faith and fair dealing.

### CONCLUSION

Evidence of Plaintiffs' claims of Southland's breach of contract and Southland's employees' allegedly fraudulent promises is excluded under the parol evidence rule. For this reason, summary judgment is GRANTED to Southland on these claims. Plaintiffs have put forth enough facts to avoid summary judgment on their claim that Southland breached the implied covenant of good faith and fair dealing, however; summary judgment is therefore DENIED to Southland on this cause of action.

SO ORDERED.