**CENTRAL MASSACHUSETTS TELEVISION, INC.,**
Plaintiff,

v.

**AMPLICON, INC., Defendant.**

**Civil Action No. 91–40107–NMG.**

United States District Court,
D. Massachusetts.

March 29, 1996.

Deborah M. Lodge, Joe R. Reeder, Patton, Boggs & Blow, Washington, DC, William S. Ahalt, Ahalt & Ball, Worcester, MA, for Plaintiff.

Richard C. Van Nostrand, Mirick, O'Connell, DeMaille & Lougee, Worcester, MA, Charles B. Straus, III, Mirick, O'Connell, & Demallie & Lougee, Worcester, MA, Jon D. Anderson, Michael W. Ellison, Latham & Watkins, Costa Mesa, CA, Neil G. Kenduck, Amplicon, Inc., Santa Ana, CA, for Defendant.

Paul P. Nicolai, Law Office of Paul P. Nicolai, Feeding Hills, MA, for Comark Communication.

### MEMORANDUM AND ORDER

GORTON, District Judge.

Pending before this Court is the objection by defendant and counterclaim plaintiff, Amplicon, Inc. ("Amplicon") to the Report and Recommendation ("R & R") issued herein on July 7, 1995, addressing: 1) the Motion for Partial Summary Judgment filed by plaintiff, Central Massachusetts Television, Inc. ("CMTV"), and 2) the Motion for Summary Judgment or in the Alternative, Partial Summary Judgment filed by Amplicon. The R & R recommended that both motions be denied, and both parties filed objections to the Report. Upon consideration of the R & R, the parties' objections and briefs filed in connection thereto and the parties original filings in connection with the cross-motions, this Court concludes that summary judgment in favor of Amplicon on all counts is should be entered.

## I. *Factual Background*

In 1991, CMTV filed a three-count complaint against Amplicon seeking money damages for breach of contract (Count I), fraud (Count II), and unfair and deceptive trade practices under M.G.L. c. 93A (Count III). The claims arise out of dealings between CMTV and Amplicon for the replacement of CMTV's transmitter equipment. Amplicon filed a counterclaim for breach of contract.

The following relevant findings of fact were made by the United States Magistrate Judge in the R & R:

1. CMTV is a Texas corporation which operates an independent UHF television station from broadcast facilities in Boylston, Massachusetts, WHLL–TV, Channel 27, licensed to Worcester, Massachusetts, by the Federal Communications Commission.

2. Amplicon is a California corporation with its principal place of business in Santa Anna, California.

3. In 1988, CMTV decided to upgrade its transmission equipment and sought a proposal from Comark, Communications, Inc. ("Comark") for the purchase of such equipment.

4. After receiving an estimate of the cost to replace its transmitter equipment, CMTV decided to replace the equipment in two phases. In late 1988 and early 1989, it commenced negotiations with Amplicon for Amplicon to finance Phase I of CMTV's acquisition of the Comark-manufactured transmission equipment.

5. By letter dated October 7, 1988, Amplicon forwarded to CMTV a Lease Agreement for the transmission equipment. The agreement provided that Amplicon would purchase transmission equipment and lease it to CMTV. The cover letter requested that CMTV return the signed Lease with a deposit check for $10,021.

6. On October 25, 1988, Richard Kawar ("Kawar"), an Account Executive at Amplicon, sent a letter to CMTV stating that Amplicon estimated "the fair market value of the transmitter equipment to be worth *10%* of its original value at the end of the lease." (emphasis in original). The letter then presented CMTV with three options at the end of

the lease: 1) cancel the lease and return the equipment, 2) refinance the equipment based on the fair market value at the end of the lease, or 3) buy the equipment based on the fair market value at the end of the lease. Kawar closed the October 25 letter by stating that "[he] believe[d] this letter will keep everyone satisfied."

7. In a letter to CMTV dated October 31, 1988, Kawar wrote:

I wanted to further clarify the end of term conditions and why the lease is structured as it is.

We are assuming a fair market value of 10% of the original cost. By selling you the equipment for the ten percent (10%) at the end of term, we can realize a fair and reasonable return on our investment.

The most important reason for retaining the operating lease structure is that Amplicon can reclaim the equipment or collect the payments in the event of bankruptcy or default. We have an agreement with the vendor whereby they will repurchase the equipment for part of the original price if we are forced to reclaim the equipment.

If we structure a capital lease with a stated buyout then it may be easily argued that the lease is a lease only for security. In case of default, rather than being the owner of the equipment, Amplicon would be treated as a secured lender only, and not as the owner of the equipment. Also, we would be unable to take advantage of the security of the vendor.

8. On November 2, 1988, CMTV returned the signed Lease Agreement ("the Phase I Lease Agreement") to Amplicon, along with a deposit check in the amount of $10,021.

9. The Phase I Lease Agreement was accepted by Amplicon on January 20, 1989. The Agreement was a form lease prepared and used by Amplicon in its equipment leasing business. The initial term of the lease was 24 months, commencing on July 1, 1989 and ending on June 30, 1991. The lease contained a provision allowing CMTV to terminate the lease at the end of the initial term upon 180 days' prior notice delivered to Amplicon by certified mail. If CMTV failed to terminate the lease in accordance with the

termination provision, the lease term would automatically be extended for an additional one-year period following the end of the initial term. The Lease Agreement also included the following integration clause, which plays a crucial role in this case:

> This is the complete Agreement by and between the parties hereto. This Agreement can only be modified by written addendum duly signed by persons authorized to sign agreements on behalf of the customer (Lessee) and by a duly authorized officer of Amplicon, Inc. (Lessor). No oral or written agreement, guaranty, promise, condition, representation or warranty shall be binding unless made a part of this Agreement by duly executed addendum. Any variance from the terms and conditions of this Agreement, unless duly executed, will be of no force and effect. All agreements, representations, and warranties contained in this Lease, or in any document or certificate delivered pursuant hereto or in connection herewith, shall survive the expiration or other termination of this Lease.... This Lease shall be construed in accordance with, and shall be governed by, the laws of the State of California.

> Defendant's Exhibit 6.[1]

10. After both parties signed the Phase I Lease Agreement, Amplicon purchased the transmission equipment from Comark for $215,000. The equipment was installed at CMTV's broadcast facility in Boylston, Massachusetts and CMTV paid the required lease payments through December 31, 1990.

11. In addition to the $10,021 deposit paid by CMTV in November 1988, CMTV paid to Amplicon an additional $53,956.06. The Phase I Lease Agreement makes no reference to either payment.

12. During the first quarter of 1990, CMTV approached Amplicon about financing CMTV's purchase of additional transmission equipment from Comark.

13. On April 12, 1990, Amplicon forwarded to CMTV a proposed lease agreement for the "Phase II" equipment purchase. As was the case with the Phase I agreement, the proposal provided that Amplicon would purchase the additional transmission equipment and lease it to CMTV.

14. On May 2, 1990, an executive at CMTV signed the proffered Phase II Lease Agreement and returned it to Amplicon. At the bottom of the agreement, the document provided that "Until this document ... has been signed by a duly authorized officer of Amplicon, Inc., it shall constitute only an offer by Lessee to enter into this Lease Agreement on the terms stated herein with Lessor."

15. As requested by Amplicon, CMTV returned the signed Phase II Agreement to Amplicon with a deposit check for $11,971.

16. In late summer or early fall, 1990, a representative of Amplicon informed representatives of CMTV during a phone conversation that Amplicon "might not want to go forward with the Phase II financing."

17. In a letter to Amplicon dated January 4, 1991, a vice president of CMTV's parent company, Corridor Broadcasting Company, wrote that:

> It was a pleasure speaking with you both yesterday and today, and I really appreciate your help with the question of our refund of deposit on the lease which didn't "fly" back in May, 1990. I shall look forward to receiving the refund check next week.

> As you agreed, you will provide me with a proposed buyout amount with respect to the [Phase I lease], between [CMTV] and [Amplicon]. I understand that the proposed buyout date will be June 30, 1991, which is the end of the base term of the lease. Although the date is somewhere [d]own the road, I believe that it is a good idea to go ahead and get started with all of the paperwork, since I will have to present

---

1. The R & R did not mention paragraph 11 of the Lease Agreement, entitled "Ownership," which provided that "Title to any Hardware shall *at all times* remain in the Lessor.... The Leased Property is and shall remain personal property of Lessor. Upon the expiration or termination of this Lease with respect to a particular Schedule(s), the Lessee at its expense shall return said items of Leased Property unencumbered to Lessor at such place within the continental limits of the United States as Lessor shall designate...." (emphasis added).

your proposal to our Board for [its] consideration.

18. In a letter dated January 11, 1991, Amplicon informed CMTV that the proposed Phase II financing had not been approved by Amplicon's Finance Committee and enclosed with that letter a check to CMTV for the amount of the deposit paid by CMTV in May, 1990.

19. CMTV did not notify Amplicon before January 1, 1991 of its intention to terminate the Phase I Lease Agreement, as required by Paragraph 2 of the Agreement. Amplicon took the position that the lease had been automatically extended for an additional one-year term as provided in Paragraph 2 of the Lease.

20. In July, 1991, CMTV obtained a preliminary injunction from the Superior Court Division of the Massachusetts Trial Court, preventing Amplicon from repossessing the equipment from CMTV's Boylston facility. The injunction was for a period of four months and required CMTV to pay Amplicon $4,000 per month as rent.

21. After the preliminary injunction expired, Amplicon repossessed the equipment and eventually sold it for $45,000.

CMTV's amended complaint alleges three claims: 1) breach of contract, 2) fraud, and 3) unfair and deceptive trade practices pursuant to M.G.L. c. 93A. Amplicon has, in turn, filed a counterclaim alleging that CMTV has breached the Phase I Lease Agreement by failing to make quarterly rent payments owed after the Lease was (automatically) extended.

## II. Standard of Review

■ Both CMTV and Amplicon have filed motions for summary judgment and/or partial summary judgment on their respective affirmative claims and dismissal of the other party's claims. When considering cross motions for summary judgment, this Court must rule on each motion separately, deciding in each instance whether the moving party has satisfied the burden set forth in Fed.R.Civ.P. 56. *Dan Barclay, Inc. v. Stewart & Stevenson Services*, 761 F.Supp. 194, 197–98 (D.Mass.1991). Summary judgment shall be rendered where the pleadings, discovery on file and affidavits, if any, show "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must view the entire record in the light most favorable to the nonmoving party and indulge all reasonable inferences in its favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.1993). The moving party must demonstrate that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). If the movant satisfies that burden, it shifts to the other party to establish the existence of a genuine material issue. *Id.* In deciding whether a factual dispute is genuine, the Court must determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## III. The Parol Evidence Rule

The gravamen of CMTV's breach of contract claim (Count I) is that there was an enforceable agreement between the parties that entitled CMTV to purchase the Phase I equipment at the end of the lease term.[2] The determination of that issue is dependent upon this Court's application of California's parol evidence rule.

### A. The Rule

California's parol evidence rule is codified in Code of Civil Procedure § 1856, which provides that:

 (a) Terms set forth in a writing intended by the parties as a final expression of

---

**2.** Originally, plaintiff also asserted a claim for breach of contract for Amplicon's violation of an alleged contract to enter into the proposed second lease or, alternatively, for breach of the proposed second lease itself. In CMTV's Opposition to Amplicon's motion for summary judg-

ment, however, it conceded, at n. 2, that it was "no longer making claims for damages based upon Amplicon's breach of [the Phase II] agreement." Accordingly, summary judgment will be allowed in favor of Amplicon as to that claim.

their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement.

(b) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement. . . .

(d) The court shall determine whether the writing is intended as a final expression of their agreement with respect to such terms as are included therein and whether the writing is intended also as a complete and exclusive statement of the terms of the agreement.

*Id.* Also relevant is § 1625 of the Civil Code, which provides that:

The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.

■ In short, the rule provides that where the parties to a contract have set forth the terms of their agreement in a writing which they intend as the final and complete expression of their understanding, it is deemed integrated and may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement. *Banco Do Brasil, S.A. v. Latian, Inc.,* 234 Cal.App.3d 973, 1000, 285 Cal.Rptr. 870 (1991), *rev. denied, cert. denied,* 504 U.S. 986, 112 S.Ct. 2967, 119 L.Ed.2d 588 (1992).

■ Despite its name, the parol evidence rule is not merely a rule of evidence concerning the method of proving an agreement. *Hayter Trucking, Inc. v. Shell Western E & P, Inc.,* 18 Cal.App.4th 1, 14, *rev. denied* (1993). Rather, the rule is one of substantive law making an integrated written agreement between parties their exclusive and binding contract "no matter how persuasive the evidence of additional oral understandings. Such evidence is legally irrelevant and cannot support a judgment."

*Marani v. Jackson,* 183 Cal.App.3d 695, 701, 228 Cal.Rptr. 518 (1986) (citation omitted). The determination of whether the parol evidence rule applies is a question of law to be made by the court. *Banco,* 234 Cal.App.3d at 1001, 285 Cal.Rptr. 870.

One of the policies advanced by the rule is the reluctance of courts to permit "clear and unambiguous integrated agreements, . . . to be rendered meaningless by the oral revisionist claims of a party who, at the end of the game, does not care for the result." *Banco,* 234 Cal.App.3d at 1011, 285 Cal.Rptr. 870; *see also Brinderson–Newberg Joint Venture v. Pacific Erectors, Inc.,* 971 F.2d 272, 277 (9th Cir.1992) (the rule "discourages sympathetic juries from releasing parties from bad bargains"), *cert. denied,* 507 U.S. 914, 113 S.Ct. 1267, 122 L.Ed.2d 663 (1993).

## B. *Application of the Rule*

■ To apply the California parol evidence rule, we need to answer two questions: 1) Was the writing intended to be an integration, i.e., a complete and final expression of the parties' agreement, precluding any evidence of collateral agreements? and 2) Is the agreement susceptible of the meaning contended by the party offering the evidence? *Gerdlund v. Electronic Dispensers Int'l,* 190 Cal.App.3d 263, 270, 235 Cal.Rptr. 279 *rev. denied* (1987). These questions are considered *seriatim.*

### 1. *Is the Writing intended to be an Integration?*

■ At the first step of the analysis, the crucial issue is whether the contracting parties intended the written instrument to serve as the exclusive embodiment of their agreement. *Banco,* 234 Cal.App.3d at 1001, 285 Cal.Rptr. 870. To resolve that threshold issue, the court properly may consider all the surrounding circumstances, including the prior negotiations of the parties. *Id.* at 1002, 228 Cal.Rptr. 518. However, in determining the issue of integration, the collateral agreement will be examined only insofar as it does not directly contradict an express term of the written agreement: "it cannot reasonably be presumed that the parties intended to integrate two directly contradictory terms in the

same agreement." *Gerdlund,* 190 Cal. App.3d at 271, 235 Cal.Rptr. 279.

In *Banco,* the California Court of Appeals enunciated four questions to be answered in making the determination of whether a writing is integrated:

1) Does the written agreement appear on its face to be a complete agreement?

2) Does the collateral agreement directly contradict the written agreement?

3) If the collateral agreement had been actually agreed to, would it certainly have been included in the written instrument? and

4) Would evidence of the collateral agreement be likely to mislead the trier of fact?

234 Cal.App.3d at 1002–03, 285 Cal.Rptr. 870.

■ In the case at bar, this Court concludes that each of the foregoing questions must be answered affirmatively and thus the Phase I Agreement is an integrated contract. First, the presence of an "integration" clause is "very persuasive, if not controlling," on that issue. *Banco,* 234 Cal.App.3d at 1003, 285 Cal.Rptr. 870; *Traumann v. Southland Corp.,* 842 F.Supp. 386, 390 (N.D.Cal.1993) ("The presence of such a clause is strong evidence of the parties' intent, although it is not dispositive"). The Phase I lease contains an integration clause that provides that it is "the *complete* Agreement by and between the parties" (emphasis added).

Moreover, the collateral agreement directly contradicts the written instrument. Amplicon persuasively argues that the suggestion that CMTV had the right to tender 10% of the original cost of the Equipment to Amplicon and keep the Equipment is flatly inconsistent with paragraph 11 of the Lease, *supra,* note 1, which provided that title to the equipment "shall *at all times* remain in the Lessor . . . ." (emphasis added).

Finally, if the collateral agreement had actually been agreed to, it certainly would have been included in the written instrument. That determination is made by examining the entire transaction and confirmed by the fact that the parties were sophisticated and experienced businessmen. *Banco,* 234 Cal.

App.3d at 1005, 285 Cal.Rptr. 870. As the Court concluded in the *Banco* case:

[i]f a prior binding commitment had been made, as opposed to incomplete negotiations, it would seem obvious, if not compelling, that the terms of such [an] arrangement would have been included in the very written agreement which purported to fully describe the entire relationship of the parties.

*Id.* at 1007, 228 Cal.Rptr. 518. Accordingly, this Court concludes that the Phase I Agreement is an integrated writing.

2. *Is the Written Agreement Reasonably Susceptible to the Meaning Supplied by the Proffered Agreement?*

■ After considering the issue of integration, the Court must next consider whether the evidence of the alleged collateral agreement is nonetheless admissible to explain the meaning of the written contractual language. *Banco,* 234 Cal.App.3d at 1008, 285 Cal.Rptr. 870 (citing *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 37, 69 Cal.Rptr. 561, 442 P.2d 641 (1968)). When the collateral agreement directly contradicts the written instrument, however, "it is not possible to say that the written instrument is reasonably susceptible to the proposed new meaning of the parties' [contractual] relationship which would be supplied by the parol evidence . . . ." *Banco,* 234 Cal.App.3d at 1008, 285 Cal.Rptr. 870. Indeed, "[t]estimony of intention which is contrary to a contract's express terms . . . does not give meaning to the contract; rather it seeks to substitute a different meaning." *Gerdlund,* 190 Cal.App.3d at 273, 235 Cal. Rptr. 279. Inasmuch as the alleged agreement providing CMTV with a 10% buy-out option directly contradicts the written Phase I Agreement, the evidence proffered by CMTV is inadmissible to explain the meaning of the written lease.

C. *The Fraud Exception to the Parol Evidence Rule*

■ CMTV next attempts to invoke the "fraud exception" to the parol evidence rule. Although a recognized exception to the parol evidence rule permits a party to introduce

evidence of fraud in order to nullify a written contract, that exception is not applicable where that party proffers the parol evidence to demonstrate a fraudulent promise directly at variance with the written agreement. *Banco*, 234 Cal.App.3d at 1009, 285 Cal.Rptr. 870; *Continental Airlines, Inc. v. McDonnell–Douglas Corp.*, 216 Cal.App.3d 388, 419, 264 Cal.Rptr. 779 (1989). The foregoing rule was articulated by the California Court of Appeals in *Bank of America v. Lamb Finance Co.*, 179 Cal.App.2d 498, 3 Cal.Rptr. 877 (1960), as follows:

> [I]f, to induce one to enter an agreement, a party makes an independent promise without intention of performing it, this separate false promise constitutes fraud which may be proven to nullify the main agreement; but if the false promise relates to the matter covered by the main agreement and contradicts or varies the terms thereof, any evidence of the false promise directly violates the parol evidence rule and is inadmissible.

*Id.* at 502, 3 Cal.Rptr. 877. Because, the alleged promise to sell the transmission equipment directly contradicts the terms of the written agreement, CMTV's effort to invoke the fraud exception to the parol evidence rule is unavailing.

In sum, although the October, 1988 letters from Amplicon to CMTV make reference to a possible buyout option, those letters were antecedent to the lease (with its integration provision) which was finally accepted. Because a collateral buyout provision would directly contradict provisions of the Phase I Lease, and because that lease was intended by the parties as a final expression of their agreement, evidence of such a prior agreement is inadmissible. Cal.Civ.Code § 1856(a). Furthermore, the execution of a contract in writing supersedes all negotiations or stipulations concerning its subject matter which "preceded or accompanied" the execution of the contract. *Id.* at § 1625.

Our conclusion is bolstered by the fact that the January 4, 1991 letter from CMTV to Amplicon stated that "*As you agreed,* you will provide me with a proposed buyout amount with respect to the lease . . . ," indicating that CMTV understood that such a buyout was not already part of the Phase I Lease. Indeed, that lease provides that:

> No oral or written agreement, guaranty, promise, condition, representation or warranty shall be binding unless made a part of this Agreement by duly executed addendum. Any variance from the terms and conditions of this Agreement, unless duly executed, will be of no force and effect.

Accordingly, Amplicon's motion for summary judgment as to Count I of CMTV's Complaint will be allowed.

## IV. *Fraud*

Count II of CMTV's Complaint alleges a claim of fraud arising out of the negotiations between the parties for a Phase II lease.[3] The gravamen of CMTV's fraud claim apparently is that, by cashing the deposit check for the Phase II lease and its subsequent actions and omissions, Amplicon induced CMTV to forbear from obtaining alternative sources of funding for the Phase II equipment, which, in turn, caused CMTV to suffer harm.[4] The Complaint further alleges that Amplicon "deliberately and fraudulently set up a circumstance to force CMTV to pay additional exorbitant sums of money or go off the air. . . ."

As an initial matter, the parties disagree as to which state's law of fraud applies to Count II of CMTV's Complaint: Amplicon

---

**3.** In addition to the alleged fraud in connection with the Phase II negotiations, CMTV's Opposition to Amplicon's motion for summary judgment suggests that its fraud claim also applies to the Phase I lease as well:

> CMTV has easily [satisfied the elements of fraud] with respect to the fraudulent statement that CMTV had a 10% buyout right, which Amplicon now says never existed, despite the never-retracted October 25 and 31 letters, despite Amplicon's knowledge of CMTV's reliance on a buy-out right, and de-

spite Amplicon's failure to attempt to nullify CMTV's reliance.

Opposition at 16. As discussed in Part III, *supra,* any evidence of "fraud" relating to the alleged 10% buyout option is barred by the parol evidence rule.

**4.** Although this Court invited the parties to submit memoranda and to attend a hearing at which oral arguments on the issue of fraud were to be heard, CMTV availed itself of neither opportunity.

maintains that the law of California or Maryland is applicable, while CMTV argues that, because the alleged fraud concerns transactions that occurred and had their effect in Massachusetts, the law of the Commonwealth governs that claim. *See Computer Systems Engineering Inc. v. Qantel Corp.,* 571 F.Supp. 1365, 1368 (D.Mass.1983), *aff'd,* 740 F.2d 59 (1st Cir.1984). There is no need to dwell on this issue, however, because the law of fraud in those several jurisdictions is similar in all material respects.

Under Maryland law, a party seeking to recover for fraud must prove:

> 1) that the defendant made a false representation,
>
> 2) that its falsity was either known to the defendant, or the misrepresentation was made with such reckless indifference to the truth as to be equivalent to actual knowledge,
>
> 3) that it was made for the purpose of defrauding plaintiff,
>
> 4) that such person not only relied upon the misrepresentation but had the right to do so and would not have done the thing from which the injury resulted had the misrepresentation not been made, and
>
> 5) that the plaintiff suffered damage from the misrepresentation.

*Parker v. Columbia Bank,* 91 Md.App. 346, 349, 604 A.2d 521, *cert. denied,* 327 Md. 524, 610 A.2d 796 (1992). The California law of fraud is identical to that of Maryland "in all material respects." *Finch v. Hughes Aircraft Co.,* 57 Md.App. 190, 231, 469 A.2d 867 (1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985), and a party asserting a cause of action in fraud under Massachusetts law must make a similar showing. Indeed, Massachusetts law defines fraud as "a false statement of material fact made to induce the plaintiff to act and reliance on the false statement by the plaintiff to [its] detriment." *McEneaney v. Chestnut Hill Realty Corp.,* 38 Mass.App.Ct. 573, 575, 650 N.E.2d 93, *rev. denied,* 420 Mass. 1107, 652 N.E.2d 146 (1995).

Amplicon advances two arguments in connection with CMTV's claim of fraud with respect to the Phase II negotiations: 1) CMTV can point to no misrepresentation by Amplicon, and 2) no facts support CMTV's claim that it reasonably relied upon any misrepresentation.

### A. Misrepresentation

■ Amplicon's first argument is that evidence supporting CMTV's claim that a misrepresentation occurred is wholly lacking. This Court agrees. The undisputed facts demonstrate that 1) CMTV signed the proposed Phase II lease and tendered a deposit, 2) the proposed lease specifically provided that until an Amplicon official signed the document it would constitute only an offer, 3) in the late summer or early fall of 1990, an Amplicon official informed CMTV that it "might not want to go forward with the Phase II financing," and 4) in January, 1991, CMTV requested the return of the deposit in a letter which acknowledged that the lease "didn't fly" back in May, 1990. Soon thereafter, Amplicon notified CMTV in writing that the proposed lease agreement had not been approved. In short, CMTV has proffered no evidence that Amplicon ever made any affirmative representation that it would enter into the proposed second lease agreement.

■ Nor has CMTV alleged that Amplicon had a duty to disclose at any time its intentions with respect to the Phase II negotiations. Indeed, under Maryland law:

> [the] mere non-disclosure of facts known to defendant without intent to deceive is not fraud and is not actionable ... unless there exists a separate duty of disclosure to plaintiff by defendant.

*Finch,* 57 Md.App. at 232, 469 A.2d 867; *accord, Robertson v. Gaston Snow & Ely Bartlett,* 404 Mass. 515, 523–24, 536 N.E.2d 344 (to recover on a claim of fraud based on an alleged omission, a plaintiff must prove the existence of a duty to disclose the information allegedly withheld), *cert. denied,* 493 U.S. 894, 110 S.Ct. 242, 107 L.Ed.2d 192 (1989).

■ The mere existence of a prior contractual relationship does not, by itself, create a confidential relationship or impose a duty of disclosure. *See Parker,* 91 Md.App. at 369, 604 A.2d 521 ("[c]ourts have been

exceedingly reluctant to find special circumstances sufficient to transform an ordinary contractual relationship between a bank and its customer into a fiduciary relationship. . . ."); *Finch*, 57 Md.App. at 236, 469 A.2d 867 ("[t]he fact that all were parties to the [earlier] Agreement did not create a confidential relationship and duty of disclosure in connection with the negotiation of the Amendment"). In sum, without of a duty of disclosure, there can be no finding of a misrepresentation for a simple failure to disclose, even assuming such a failure occurred.

## B. *Reasonable reliance*

 Assuming, *arguendo*, that CMTV could demonstrate that an actionable misrepresentation occurred, CMTV is nonetheless unable to show reasonable reliance. In making the determination of whether reliance is reasonable, a court is required "to view the act in its setting, which will include the implications and promptings of usage and fair dealing." *Giant Food, Inc. v. Ice King, Inc.*, 74 Md.App. 183, 192, 536 A.2d 1182 (1988); *accord, Robertson*, 404 Mass. at 523, 536 N.E.2d 344.

In the case at bar, by late 1990, CMTV was aware of Amplicon's hesitation in entering the proposed second lease. As further evidence that the parties were merely in the negotiation stage of the Phase II lease, the express language in the proposed agreement required its execution by Amplicon before it became effective. Those factors preclude CMTV from establishing that it reasonably relied to its detriment upon Amplicon's failure to notify it of a decision not to enter into the Phase II lease agreement. Accordingly, summary judgment in favor of Amplicon with respect to Count II of CMTV's Complaint will be allowed.

## V. *Chapter 93A Claim*

 Count III of CMTV's Complaint alleges that Amplicon's business practices constitute unlawful and deceptive trade practices in violation of M.G.L. c. 93A, § 2. As a threshold matter, it is worth noting that Chapter 93A does not require that, as a jurisdictional prerequisite, the conduct of the defendant giving rise to the claim must have occurred primarily and substantially in Massachusetts; rather, it is a defense to a 93A claim if the defendant can demonstrate that the requisite contacts with Massachusetts are lacking. As the First Circuit Court of Appeals has observed, the defendant "bear[s] the burden of proving a lack of primary and substantial involvement in Massachusetts." *Kansallis Finance Ltd. v. Fern*, 40 F.3d 476, 481 (1st Cir.1994). In the case at bar, Amplicon contends, and this Court agrees, that it has satisfied that burden.

 In undertaking the "pragmatic, functional analysis" whether any alleged deceptive act or practice occurred "primarily and substantially" in Massachusetts, at least three factors are to be considered: 1) where the defendant committed the deceptive or unfair acts or practices, 2) where the plaintiff received and acted upon the deceptive or unfair statements, and 3) where the plaintiff sustained losses due to the unfair acts or practices. *Clinton Hosp. Ass'n v. Corson Group, Inc.*, 907 F.2d 1260, 1265–66 (1st Cir. 1990) (citing *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662 (1985)). It should be noted that Massachusetts courts have explicitly rejected a pure "place of injury" test. *See, e.g., Goldstein Oil Co. v. C.K. Smith Co., Inc.*, 20 Mass.App. Ct. 243, 249 & n. 7, 479 N.E.2d 728 *rev. denied*, 395 Mass. 1104, 482 N.E.2d 328 (1985).

## A. *Where the deceptive or unfair acts were committed*

 The facts in this case when applied to the first factor unquestionably weigh in favor of Amplicon. As noted by the Magistrate Judge, "Amplicon's corporate offices are located in California and it is undisputed that all of the alleged wrongful conduct was committed by representatives of Amplicon while in California." R & R at 16. CMTV's argument with respect to this first factor is that:

> Amplicon intended its . . . scheme would have its primary effect in Massachusetts, where CMTV is located; where the Phase I equipment was manufactured, installed, and used at CMTV's transmitter site in Boylston; where Amplicon ultimately came

to remove the disputed Phase I equipment; and where CMTV is grossly burdened by the charge that it owes another $248,596 for equipment for which CMTV already has paid $364,380, for a total of $612,976. Opposition at 14. Such an argument is unpersuasive, however, because it attempts to twist the analysis into a pure "place of injury" test which, as noted above, Massachusetts courts have declined to adopt. *See, e.g., Goldstein Oil Co.,* 20 Mass.App.Ct. at 249 & n. 7, 479 N.E.2d 728.

B. *Where the plaintiff received and acted upon the deceptive or unfair statements*

In concluding that the facts in this case when applied to the second factor "tip[s] slightly in Amplicon's favor," R & R at 17, the Magistrate Judge found the following facts to be relevant:

> most if not all of the communications between the parties involved telephone conversations and correspondence between representatives of Amplicon in California and representatives of CMTV in Maryland; Mr. Kawar's letters regarding the buy-out option are addressed to Mr. White in Maryland; the Phase I Lease Agreement lists a Maryland address for CMTV; [and] at least two letters from Mr. White to [ ] Amplicon request that he be contacted in Maryland. At the same time, Mr. White states that although representatives of Amplicon often reached him in Maryland, he spent significant time in Massachusetts ... Mr. White testified at his deposition that he *may* have received *some* communications from Amplicon in Massachusetts.

*Id.* at 16–17. (emphasis added). For the reasons stated above, this Court concludes that this second factor weighs substantially in favor of Amplicon.

C. *Where the Injury occurred*

The third and final factor in the analysis, where the injury occurred, is also the least disputed. The R & R concluded that "it is clear that CMTV sustained losses in Massachusetts due to Amplicon's [actions]," R & R at 17, and Amplicon acknowledges that the injury (at least in part) may have occurred in that forum. Indeed, this factor clearly tips in CMTV's favor, because 1) the transmitting

equipment originally in Boylston was removed by Amplicon from CMTV's transmitter site, 2) CMTV was forced to replace the Phase I equipment in Boylston at significant cost, and 3) CMTV's revenues have been harmed due to its inadequate equipment in Boylston.

This Court concludes, however, that Amplicon has satisfied its burden of proving a lack of "primary and substantial" involvement in Massachusetts to avoid liability under M.G.L. c. 93A. Although the pragmatic, functional analysis of whether an act occurred "primarily and substantially" in Massachusetts is not necessarily limited to the three factors discussed *supra,* see *Clinton Hosp. Ass'n,* 907 F.2d at 1266, it is nonetheless true that two of the three identified factors weigh in favor of Amplicon.

Moreover, when "place of injury" is the only factor weighing in favor of a claimant, the admonition of Massachusetts courts that liability under chapter 93A is not to be imposed lightly is particularly relevant. *See Clinton Hosp. Ass'n,* 907 F.2d at 1266 ("We are mindful of warnings that courts should not make the 'place of injury or loss' determinative"); *Goldstein Oil Co.,* 20 Mass.App.Ct. at 249 n. 7, 479 N.E.2d 728 (applying a "place of injury" test would virtually eliminate the "primarily and substantially" exception to 93A liability). Accordingly, summary judgment in favor of Amplicon will be allowed as to Count III of CMTV's complaint.

VI. *Amplicon's Counterclaim*

Paragraph 2 of the Phase I lease agreement provided that the lease term would be extended for one year unless CMTV gave Amplicon "written notice of [CMTV's] election not to extend the [ ] Lease Term at least ... 180 days prior to the expiration of the initial Base Lease Term." The Lease further provided that any such written notice "shall not be effective unless it is actually received by [Amplicon] at least 180 days" prior to the expiration of the initial base lease term.

 It is undisputed that Amplicon received no written notice from CMTV of its decision to terminate the lease before Janu-

ary 1, 1991 and that CMTV did not pay the rent required by the lease for any period after June 30, 1991. Because options to renew or extend are stringently enforced under California law, see *Palo Alto Town & Country Village, Inc. v. BBTC Co.*, 11 Cal.3d. 494, 498, 113 Cal.Rptr. 705, 521 P.2d 1097 (1974); *Simons v. Young*, 93 Cal.App.3d 170, 189, 155 Cal.Rptr. 460 (1979), this Court concludes that summary judgment in favor of Amplicon with respect to its counterclaim should be allowed.

### ORDER

For the foregoing reasons, Amplicon's motion for summary judgment is ALLOWED and CMTV's motion for summary judgment is DENIED.

SO ORDERED.